UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY CURRY,

           Petitioner,

                                        Case Number 14-10747
v.                                        Honorable David M. Lawson

PAUL KLEE,

           Respondent.

_____/

## <u>OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS</u>

Petitioner Jeffrey Curry shot Dedrick Jackson on the front porch of a house in Saginaw, Michigan in July 2006. Jackson died of his wounds. Curry confessed to shooting Jackson, insisting that it was done in self-defense. Curry's statement was admitted at his trial, and a jury convicted him of second-degree murder and related crimes. After failing to obtain relief in the Michigan appellate courts, Curry filed this habeas corpus action challenging the admission of his confession, which, he claims, violated his rights under the Fifth Amendment's proscription against self-incrimination. The Michigan Court of Appeals held that Curry's confession was voluntary, his waiver of his *Miranda* rights was voluntary, the "midstream" administration of *Miranda* warnings did not violate Supreme Court precedent, and the admission of the confession was constitutional. Those determinations, save one, reasonably applied Fifth Amendment jurisprudence as established by the Supreme Court. The state courts' admission of Curry's pre-warning statement was contrary to the clearly-established rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), but the resulting error did not have a substantial and injurious effect or influence on the jury's verdict. Therefore, the Court will deny Curry's petition.

I.

The shooting took place at a house on South 11th Street in Saginaw, Michigan, where Christopher Ray lived with his girlfriend and her parents.  Ray testified that on July 13, 2006, in the early morning hours just after midnight, he was in the living room along with Jackson and his girlfriend's parents, Wayne and Donna Molda, when he heard a knock on the door.  As he went to answer the door, he asked who was there and someone replied, "Jeff."  He opened the door and saw the petitioner, whom he knew from school, and another, unknown man.

Ray turned on a porch light.  The petitioner asked him where Jackson was.  Jackson came to the door and went out on the porch.  Ray then noticed that the petitioner and the unknown man were armed with guns.  The petitioner had a black revolver in one hand crossed under his other arm.  The unknown man pulled out a semiautomatic and cocked it.  The petitioner said to Jackson, "You're going around telling people you're going to kill me because I pulled a gun on you.  This time you're going to lay down."  Ray thought that meant there was going to be trouble and said, "Please don't do this."  He shut the front door and ran out the back door.  Within a few seconds, he heard gunshots fired one after another, but he did not see the shooting.

When he got outside, he laid down in tall grass until the shooting stopped.  Ray returned to the house through the back door and went to the porch.  Jackson was shot and lying on his back.  There were bullet holes in the front doors and in a wall and bedroom door inside the house.  Ray guessed that he heard 10 gunshots and thought they came from two guns.

Jackson suffered two gunshot wounds to the right leg and a fatal gunshot wound to the back of the head.  He apparently died at the scene.  His body was transported to a hospital, where bullets were recovered from his sock and his pants.  At autopsy, another bullet was recovered from

Jackson's brain.  Police technicians also recovered bullets and fragments from the scene.  A ballistics expert testified that five separate bullets were fired from one gun, likely a revolver, due to the lack of shell casings at the scene.  It was his opinion that the shooter was on the porch when he fired.  The medical examiner testified that he did not believe that the shot to the head was inflicted during a struggle.

Saginaw police officers responded to the scene and learned that the petitioner was a suspect in the shooting.  Using a Crime Stoppers tip and cell phone triangulation, they located a vehicle carrying someone in the passenger seat fitting the petitioner's description.  The police followed the vehicle and called for back-up.  After the vehicle stopped, they approached it to apprehend the occupants, but the vehicle sped away.  A chase ensued.

When the vehicle finally stopped, the two occupants exited and ran.  One officer stopped his car, got out, and ran toward the passenger, who was later identified as the petitioner.  Marked patrol cars arrived, and the petitioner darted in front of one of them.  The car struck the petitioner, who rolled up on the hood and then fell to the ground.  Another officer caught up to him, two others were on top of him, and he was yelling and resisting.  Officer Allen Rabideau struck the petitioner several times on the back of the head with his open hand.  The petitioner continued to struggle as he was handcuffed.

The petitioner continued to thrash about, which resulted in his shirt being torn and his gold chain being broken.  Officers put him in the back of a patrol car and took him to the police station, where he was interviewed by detectives.  Officer Rabideau said that the petitioner complained about back pain when they first got into the patrol car.  He later asked the petitioner if he wanted to go to the hospital, but the petitioner declined, then vacillated about whether to go.  After the interview,

Officer Rabideau took the petitioner to the hospital where he was examined and released.  Officer Rabideau then took the petitioner to the jail.

At the police station, Detective Robert Ruth spoke with the petitioner for a few minutes before he informed him of his *Miranda* rights, had him sign a waiver form, and questioned him further.  The interview was recorded and transcribed.  The interview was played for the jury and the transcript was admitted into evidence.  In that interview, the petitioner admitted being at the house and shooting Jackson, but claimed it was in self-defense.  He said that Jackson had shot at him the day before the incident and that Jackson had shot him in 1998, leaving scars on his stomach.  The petitioner said that he went to Ray's house to buy cocaine, but he did not know Jackson was there, and that Jackson came to the door, put a gun to his stomach, and threatened to kill him.  They struggled over the gun.  The petitioner got the gun and shot Jackson.  He fired the gun until it was empty.  He knew that he shot Jackson in the leg because Jackson fell to the ground.  The petitioner dropped the gun on the porch and left.  The petitioner initially stated that he went to the house alone, then with a woman, then with a man.  He ultimately claimed that the man who was with him shot Jackson in the head.

Before trial, defense counsel moved to suppress the petitioner's police statements, asserting that they were involuntary due to police coercion and the petitioner's alcohol and drug usage.  The trial court conducted a hearing, reviewed a video of the petitioner's interview, and denied the motion.

At the conclusion of the trial, the jury convicted the petitioner of second-degree murder, Mich. Comp. Laws § 750.317, carrying a concealed weapon, Mich. Comp. Laws § 750.227, resisting or obstructing a police officer, Mich. Comp. Laws § 750.81d(1), and possession of a firearm during

-4-

the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b.  He was sentenced to concurrent prison terms totaling 25 to 50 years for all crimes except the felony firearm conviction, for which he was given a consecutive, two-year sentence.

The petitioner filed a direct appeal in which he challenged the admissibility of his confession. The Michigan Court of Appeals affirmed his convictions, but remanded for correction of the judgment of sentence.  *People v. Curry*, No. 279254, 2009 WL 638202 (Mich. Ct. App. March 12, 2009) (unpublished).  The petitioner filed an application for leave to appeal in the Michigan Supreme Court, which, in lieu of granting leave to appeal, vacated the Michigan Court of Appeals's judgment and remanded the case to the trial court for factual findings on the suppression motion. *People v. Curry*, 485 Mich. 903, 773 N.W.2d 15 (2009).

On remand, the trial court conducted a new evidentiary hearing and denied the suppression motion, finding that the petitioner's pre-*Miranda* and post-*Miranda* statements to the police were knowing, intelligent, and voluntary and that the delay in advising him of his *Miranda* rights did not render his statements inadmissible.  In the ensuing appeal, the Michigan Court of Appeals again affirmed the convictions, *People v. Curry*, No. 302821, 2012 WL 1959630 (Mich. Ct. App. May 31, 2012), and the state supreme court denied leave to appeal, *People v. Curry*, 493 Mich. 893, 822 N.W.2d 567 (2012).

The petitioner, through counsel, thereafter filed his federal habeas petition.  He raises the following claims:

I.      The Michigan Court of Appeals unreasonably applied Supreme Court law and denied Petitioner's due process rights when it found that a confession was voluntary, where it was taken immediately after drug and alcohol intoxication, sleep deprivation, serious physical injuries inflicted by police and the deliberate withholding of medical treatment.

-5-

II.    The Michigan Court of Appeals unreasonably applied Supreme Court law when it found that detectives' mid-stream recitation of *Miranda* rights did not violate Petitioner's Fifth Amendment right against compelled self-incrimination.

The respondent opposes the petition contending that the claims lack merit and do not warrant federal habeas relief.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Curry filed his petition after the AEDPA's effective date, its standard of review applies. Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

-6-

existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014); *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

## A.

The petitioner's first issue focuses on the voluntariness of the confession itself.  The petitioner contends that at the time he made his statement, he was under the influence of drugs and alcohol, he had been struck by a police car, beaten by officers, and his requests to go to the hospital were refused.  These allegations were explored at the post-remand evidentiary hearing.

At that hearing, Saginaw Police Officer Barry Dobis testified that he participated in the pursuit of the petitioner's vehicle in his marked patrol car. When he saw the vehicle stop and the petitioner running away, he followed the petitioner in his patrol car. At one point, the petitioner ran into the front of his patrol car, rolled on top of the car, and fell to the ground as he applied the brakes. Dobis estimated that he was going 10 to 15 miles per hour when he hit the petitioner. Other officers were involved in handcuffing the petitioner and taking him into custody.

Officer Matthew Ward testified that he participated in the pursuit of the petitioner's vehicle in his marked patrol car. He was the lead patrol car. When the petitioner's vehicle stopped, he saw the petitioner run into Officer Dobis's patrol car, roll onto the hood, and fall to the ground. Officer Ward ran up to him as other officers were pushing him face down and yelling at him to put his hands behind his back, but he was not complying. He saw Officer Rabideau strike the petitioner on the back of the head three or four times as he was yelling at him to put his hands behind his back. He did not see the petitioner's head bounce off the ground. After a few moments, officers were able to get his hands behind his back and handcuff him. The petitioner did not appear to be injured from the collision with the car.

Officer Allen Rabideau testified that he participated in the pursuit of the petitioner's vehicle. He saw the petitioner flee from the vehicle, get hit by Officer Dobis's patrol car, roll onto the hood, and fall to the ground. He guessed that Dobis's car was going 25 miles per hour, but was unsure of the speed. Rabideau ran to the petitioner, pushed him to the ground, and yelled at him to put his hands behind his back. The petitioner had his hands in front of him and was not complying. The petitioner kept yelling that he was not the driver. Rabideau then struck the petitioner on the back of head five or six times with an open hand and again yelled at him to put his hands behind his back.

-8-

Rabideau did not see the petitioner's head bounce on the ground. He thought the struggle lasted one or two minutes before the officers forced the petitioner's hands behind his back and handcuffed him. The petitioner continued to struggle after he was handcuffed and on his feet, which is when his shirt was torn and his gold chain was broken, before being put in his patrol car. Rabideau drove the petitioner to the police station and put him in an interview room for the detectives. During that time, the petitioner did not say he was injured nor ask to go to the hospital. Rabideau noticed an abrasion on the petitioner's cheek, but did not feel that emergency services were needed. Rabideau saw no indication that the petitioner was intoxicated or under the influence of drugs. The petitioner had no trouble walking. The petitioner wanted to talk with someone, but Rabideau told him to wait for the investigators. Rabideau testified that he stood outside the door during the petitioner's interview. The petitioner requested medical attention after the interview, then vacillated about whether he wanted to go to the hospital. Rabideau decided to take him to the hospital to make sure that there were no medical issues. The petitioner was examined at the hospital and released. Rabideau then drove him to the jail.

Detective Robert Ruth testified that he investigated the scene of the shooting and gathered information about the petitioner and his location. He and Detective Walny also followed the pursuit of the petitioner and Ruth saw the petitioner get struck by the patrol car, roll onto the hood, and fall to the ground. By the time he approached, the petitioner was in custody.

Ruth and Walny interviewed the petitioner at the police station. That interview lasted about 1.5 hours and was recorded. Ruth recalled that the petitioner mentioned going to the hospital and he told him that they would take him when they were done. Ruth saw a mark on the petitioner's face, but did not think that he needed immediate medical attention. At the end of the interview, the

petitioner said he did not want to go to the hospital, but Ruth told an officer to take him to make sure that he was okay. Ruth testified that there was no indication that the petitioner was intoxicated or high during the interview and he never said that he was under the influence at that time, although he indicated that he had used cocaine sometime previously. Ruth said that the petitioner gave cogent answers, was alert and active, moved around during the interview, listened to the questions, and did not complain about being in pain. Ruth recalled advising the petitioner of his *Miranda* rights and having him sign a waiver form. He also recalled asking the petitioner about the old wound on his stomach and being surprised by the petitioner's response indicating that the deceased victim had shot him in the past. He asked the petitioner if he shot the victim in self-defense. The petitioner did not complain about how he was treated during the interview and seemed to like him. Ruth did not deceive the petitioner nor promise him anything during the interview.

The petitioner testified that he was 28 years old at the time of the incident and that he had a ninth grade education. He claimed that he had been up all night after the shooting, had drunk a half pint of brandy, had taken eight Soma and eight Vicodin pills, and had snorted cocaine, but had not eaten. During the car chase, he was in the back seat being tossed around and hitting his head. He recalled running from the vehicle after the driver stopped and claimed that the patrol car was doing 30 miles per hour when it struck him and he fell to the ground. He tried to stand up, but officers beat him. He said that one officer hit him in the head with his fists and bashed his head on the cement. He believed that more than one officer hit him. The petitioner said that he hurt his back and one of his legs. He asked to be taken to the hospital, but the police ignored him. When he told Officer Rabideau that he wanted to go to the hospital, Rabideau told him to be quiet before he choked him. He recalled telling Detective Ruth that he wanted to go the hospital and Ruth saying

-10-

that he could go when they were done with him.  The petitioner also testified that he had been shot in the back in 1998 and the bullet exited his stomach, which required surgeries and left him in a coma for 3.5 months, and that he had been shot in the head four times.  The petitioner claimed that those injuries caused him to be forgetful and to have memory loss.  The petitioner did not remember making his statement at the police station or going to the hospital.  His next memory was waking up in jail two days later and being in pain, although he did not complain to jail personnel.  The petitioner acknowledged that he had a prior felony conviction for carrying a firearm and other arrests, but said that he had never previously been advised of his *Miranda* rights; he learned about them while in prison.

The petitioner's hospital records and the transcript and video of the petitioner's police interview were admitted into evidence.  The hospital records indicated that the petitioner had a facial abrasion, and pain and bruising on his left leg, right forearm, and back.  He had no broken bones, internal injuries, or neurological damage.  He was alert, oriented, and calm with normal vital signs. He was discharged about four hours after arrival.

At the conclusion of the hearing, the trial court denied the suppression motion finding, among other things, that the petitioner's statements were voluntary, paying particular attention to the videotape of the confession.  The court found that the petitioner was "coherent, did not appear to be in any distress at all," and that there was "no evidence of any force or coercion.  Nobody tried to trick him by deceit or by promises.  He didn't appear to be ill, confused, sleepy, stoned from drugs or medication or illegal substances."  The court also noted that "[t]here was other testimony that there was no smelling of alcohol by the officers, no appearance of intoxication, no signs of drugs, never said he took drugs, didn't need assistance in walking, appeared to be okay."

-11-

The Michigan Court of Appeals affirmed that ruling, affording "deference to the trial court's determinations as to the relative weight and credibility of the evidence." *People v. Curry*, No. 302821, 2012 WL 1959630, at *3 (Mich. Ct. App. May 31, 2012). The court stated that the trial court weighed the appropriate factors — the petitioner's age, education and intelligence level, previous experience with the police, nature and length of the questioning; the length of the pre-statement detention, advice of constitutional rights, unnecessary delay (if any) in bringing him before a magistrate, the petitioner's injuries, his level of intoxication, his need for food, sleep, or medical attention, whether any physical abuse occurred, and whether the suspect was threatened with abuse — and concluded that in "the totality of the circumstances, we are not convinced that a mistake was made in denying [the petitioner's] motion to suppress his statement." *Ibid.*

These determinations reasonably applied — and do not contravene — federal constitutional law as established by the Supreme Court. Certainly, the Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). But under federal law, a confession is not considered involuntary unless (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (emphasis in original). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Factors to consider include many of those considered by the state courts: the presence or absence of police coercion (a "crucial element"), length of interrogation, location of interrogation, continuity of interrogation, the

-12-

suspect's maturity and education, the suspect's physical condition and mental health, and whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Without coercive police activity, however, a confession should not be deemed involuntary. *Connelly*, 479 U.S. at 167 (stating that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). The burden of proving that a confession was given involuntarily rests with the petitioner. *Boles v. Foltz*, 816 F.2d 1132, 1136 (6th Cir. 1987). Voluntariness need only be established by a preponderance of the evidence. *Ibid.*

The state courts faithfully applied these principles, and for several reasons this Court cannot disagree with their conclusions. *First*, there is no evidence that the police coerced the petitioner through force, threats, promises, deceit, or any other means into making a statement. The Court's own review of the transcript and the video reveals that the petitioner was eager to speak with the police and tell his side of the story.

The petitioner contends that the police engaged in coercion by intentionally withholding medical care as a *quid pro quo* for him providing a statement. The intentional withholding of medical care for a serious injury or medical condition can be coercive. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 397-401 (1978) (holding that a *Miranda* waiver and statement were coerced and involuntary where defendant was seriously wounded a few hours before the interrogation, was in intensive care, was depressed, complained of unbearable pain, appeared confused, responded incoherently to some questions, said that he was confused and could not think clearly, and asked the police to stop the interrogation, which lasted for four hours); *Beecher v. Alabama*, 389 U.S. 35, 36-38 (1967) (coercion found where the defendant's first confession was made after he had been shot

-13-

in the leg and an officer ordered him at gunpoint to confess or be killed, and his second written confession was made a week later in a prison hospital while he was on morphine, left alone with police, and a medical assistant warned him to cooperate and told the police to let him know if he did not tell them what they wanted to know); *Reck v. Pate*, 367 U.S. 433, 441-42 (1961) (confession was involuntary where officers held the defendant for four days with inadequate food and medical attention).  But no such coercive activity occurred in this case.  Although the petitioner had been struck by a patrol car while fleeing the police and hit several times in the head by a police officer during the struggle to handcuff him, he did not suffer serious injuries.  The medical records disclosed that he had no broken bones, internal injuries, or neurological impairment and he only suffered an abrasion on his cheek and pain and soreness on his leg, arm, and back.  He had no difficulty walking, moving around, speaking, or responding coherently to questions.

Although the petitioner initially said that he wanted to go to the hospital, he did not object when he was told that he would be taken to the hospital when he was finished at the police station, nor did he complain of significant pain or say that he was unable to speak with the police due to his injuries during the interview.  The video record does not suggest that his physical condition distracted him in any way during the interview.  And at the end of the interview, he even vacillated about his desire for medical care, but was taken to the hospital to ensure his well-being.  The investigating officers, who did not cause the petitioner's injuries, never said that his medical care was contingent upon him providing a statement or waiving his *Miranda* rights.  Rather, they assured him that they would look into what happened during his arrest, take pictures, and get him medical care when they were done at the police station.  They advised him of his rights and further informed him that he was under no pressure to talk to them and that they would stop anytime he did not want

-14-

to continue talking to them. The record simply does not support the petitioner's argument that the police engaged in coercive activity which overcame his will or that his medical condition interfered with his ability to waive his rights and speak with police.

*Second*, the other circumstances surrounding the interview support the state court's determination that the petitioner's police statement was voluntary, knowing, and intelligent. The interview was conducted in an air-conditioned interview room at the police station. It took place shortly after the petitioner's arrest and only lasted for about 90 minutes. The petitioner was 28 years old at the time, had at least a ninth-grade education, and was familiar with the criminal justice system through a prior felony conviction (and possibly other arrests). There is no evidence that the petitioner suffered from a mental disability or was otherwise unable to understand the nature and severity of his situation.

The petitioner asserts that he was under the influence of alcohol, a copious amount of prescription drugs and cocaine, and that he was sleep-deprived at the time of the interview. The police officers, however, testified that there was no indication that the petitioner was under the influence of alcohol or drugs at the time of his arrest and interview and that he was alert, active, and responsive during the interrogation. The state courts found the officers' testimony to be credible. That credibility determination is entitled to deference and presumed correct on federal habeas review. *Miller*, 474 U.S. at 112. The video record presents a high hurdle for the petitioner to overcome that presumption: there is no indication that the petitioner was under the influence of alcohol or drugs to any significant degree, he did not exhibit signs of sleep-deprivation or exhaustion while being questioned, and he was alert and able to participate in the interview without any difficulty. The hospital records, compiled just after the interview was over, do not contain any

-15-

notation that the petitioner was under the influence of alcohol or drugs, or was otherwise incoherent or impaired.

*Third,* the petitioner was advised of his *Miranda* rights verbally and in writing (albeit a few minutes into the interview), indicated that he understood each of those rights, waived those rights, and signed a written waiver form.  He was also told that he could stop the interview at any time. Considering the totality of the circumstances, the Court finds that the petitioner's police statements were voluntary, knowing, and intelligent.  Habeas relief therefore is not warranted on the claim that the confession was inadmissible because it was involuntary.

## B.

The petitioner also argues that the confession was inadmissible because the *Miranda* warnings were not given until the conversation with the police officer was underway.  Those "midstream" warnings, the petitioner contends, rendered his *Miranda* waiver involuntary and violated a constitutional rule established by Supreme Court precedent.  To assess that claim, it is useful to consider the full part of the statement dealing with the rights advice and waiver.  Two detectives were present: Robert Ruth ("Q") and J. Walny (Q2).  The following statement is taken from the transcript.

A They fucked me up.

Q Who did? The officers?

A They ran me over man like 30 mph man.

Q We'll talk about that too.

A Sir, I wasn't even driving man. (Inaudible).

Q Yeah. What happened to your stomach there anyway? You got shot?

-16-

A That mother fucker shot me.

Q Oh Frank Nitty?

A The dude.

Q Who?

A That's dead.

Q Oh the one now? Is he the one that did that to you?

A That bitch shot at me yesterday.

Q Oh did he? Okay. Well that's what we got to talk about.

A Listen . . . listen, I went to a house. I didn't even fucking go . . . I didn't even know he was in there. The mother fucker came outside and put a gun to my stomach and I took it. We tussled for it.

Q Okay. And you shot in self defense is what you're saying?

A Sir . . . but I . . . I . . . I guess so.

Q Okay.

A The mother fucker. . . the mother fucker he had been picking with me forever man cause the mother fucker know I got this . . . I got this. I been in Covenant three and a half months man.

Q Yep.

A I been fucked up right.

Q Okay. This is my partner Det. Walny.

Q2 How you doing?

Q I think . . . I know he talked to you out there (inaudible).

Q2 I was the one in the back seat talking to you. You remember that?

A Who ran me over man?

Q2 I didn't see . . . I honest to God I did not see it.

A I want to go to the hospital.

Q2 What's that?

Q Yeah, we're gonna take you when we get done here.

A . . . my leg . . . my leg and my back. They ran me over hard man.

Q2 That happened before we got there so I don't know.

A But I wasn't even driving sir.

Q2 Okay.

Q Okay.

A (Inaudible). (Inaudible) and that's my kids and shit man.

Q Exactly.  Now I know you're saying that it was self defense, and like I say I got questions for you, you got questions for me obviously. Okay we got to get this straight. You are in custody right now so I have to read you your rights okay?

A Yes sir.

Q Okay. Um . . . .

A I know you man. I know you too.

Q Where you know me from?

A The streets.

Q Oh yeah.

A And Mata . . . and Mata. I know Mata. Mata's a good dude.

Q If you mess with him or you do something wrong he's on you.

A You know what, a mother fucker told him I was a gun runner and a drug dealer. Listen, he caught me two times.

Q Um huh.

-18-

A He ain't find shit. He left me alone man. I ain't got shit to say about Mata now. He straight.

Q Yeah. He's straight.

Q2 Yeah. He's honest and he's fair.

A Who fucking ran me over?

Q I don't know.

A That mother fucker hit me doing 40, knocked me out man and then whoever grabbed me they grabbed me by the head and they did like this . . . I had put my hands behind my back. The mother fucker bam! bam! bam! on the concrete man.

Q Yeah. We'll take . . . we'll get you over to the hospital when we get done talking and we'll take some pictures of that. We'll get to the bottom of it.

A They fucked me up.

Q We'll figure out what's going on with that. Um okay what I'm gonna do here . . . I already filled this out. At the top here it says your rights. Do you know . . . I don't want to be facetious or nothing, but do you know how to read and write?

A Yes sir.

Q How far did you make it in school?

A Eleventh.

Q Eleventh grade?  Okay. I'll read this to you okay and you just follow along. Up here is the case number.  It's 06-6566.  It's ah we're at the Saginaw Police Department. Today's date is 7-13-06.  Now I put down 1550 hours.  And what that means is Military time for ten to four okay?  Um before we question you you must be aware of your rights you have the right to remain silent.  Anything you say will taken down in writing and used against you in court.  You have the right to talk to an Attorney before we talk to you and have him present during questioning.  If you cannot afford an Attorney one will be appointed for you by the court at no cost to you.  If you decide to answer any questions without the presence or advice of an Attorney, you may stop at any time you wish and request an Attorney before continuing.  I'm not gonna pressure you to talk to us.  We're gonna talk like men.

A Yes sir.

Q And you know that's how we're gonna do it. All right?

A I understand that.

Q I have read, have had read to me the statement of my rights shown above. I understand my rights. You understand what your rights are? You can just sign that right there.

A I man y'all the goodest cops man today.

Q Well we're here just to ah . . .

A Them other guys fucked me up.

Q Yeah. I called you in the middle of the night and left a message for you.

A (Inaudible).

Q I know you're scared . . . .

A I mean I ain't scared man, it's just the mother fucker that dude . . .

Q Well before we get into that let's . . . .

Q2 We'll get into that, but we want to do everything by the book here okay?

A I understand you sir. I ain't disrespecting y'all or nothing.

Q2 No . . . and it's not . . . we just want to make sure that you're not . . . your rights are taking care of.

Q And then down here on the waiver portion, it's I'm willing to answer questions or make a statement without conferring with an Attorney or having an Attorney present. No promises or threats have been made to me in regards to this statement. I do not want an Attorney at this time. I'm not gonna threaten you. Anytime you want to quit talking, we're gonna quit talking. I'm not gonna pressure you to talk.

A Read it for me one more time for me sir.

Q Okay. Yeah. It's the waiver portion. I am willing to answer questions or make a statement without conferring with an Attorney or having an Attorney present. No promises or threats, I'm not promising you anything and I'm not gonna threaten you.

A Yes sir.

-20-

Q No promises or threats have been made to me in regards to this statement.

A I understand.

Q I do not want an Attorney at this time. Do you understand that?

A I understand that sir.

Q2 So it's up to you if you want to talk to us.

A I'm a talk to y'all (inaudible).

Q Okay. Well there's always two sides to a story.

A I ain't gonna hang myself.  I know what I'm doing.

Q Okay.

A And I'm gonna let y'all know the real fucking truth cause that mother fucker tried to kill me.

Q Yep.  Well we got to know . . . we got to know the truth to what's going on.  And I'll sign down here.

Q2 And see and the thing is we know there's two sides to every story.  We want to get both sides here, but it doesn't help your side if you try to run or you try to avoid us.

The trial court, announcing its decision from the bench, found that giving the petitioner *Miranda* warnings after the interrogation was underway did not undermine the voluntariness of the waiver of rights, and it did not render the statement — both before and after the warnings were given — inadmissible.  In arriving at the decision, the court found that *Oregon v. Elstad,* 470 U.S. 298 (1985), was "controlling authority."  The court denied the motion to suppress the petitioner's statement.

The Michigan Court of Appeals affirmed.  *People v. Curry*, No. 302821, 2012 WL 1959630 (Mich. Ct. App. May 31, 2012).  That court also relied heavily on *Elstad* and distinguished the case

-21-

of *Missouri v. Seibert,* 542 U.S. 600 (2004), finding that "no evidence supports that during the initial questioning the police deliberately utilized an interrogation technique 'calculated . . . to undermine the *Miranda* warning.'" *Curry*, 2012 WL 1959630, at *2 (quoting *Seibert,* 542 U.S. at 622 (Kennedy, J., concurring).

*Oregon v. Elstad* and *Missouri v. Seibert* are the Supreme Court cases that establish the boundaries for the propriety of confessions obtained when *Miranda* warnings are not given until the interrogation is underway.  In *Elstad*, the police went to Elstad's home to arrest him for a neighborhood burglary.  When an officer said that he thought Elstad was involved, Elstad admitted that he was present.  The police took Elstad to the police station where he was advised of his rights and made a written confession.  Elstad moved to suppress both statements, arguing that his first unwarned statement "let the cat out of the bag" and tainted his subsequent, warned confession.  The trial court suppressed the first statement but admitted the second one.  The state appellate court reversed and the state's highest court declined review.  The Supreme Court reversed, rejecting the notion that an initial, unwarned statement inherently taints a subsequent, warned statement and renders it inadmissible.  The Court held that "a suspect who has once responded to unwarned yet uncoerced questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318.  The Court explained:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.  A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Elstad*, 470 U.S. at 314.  The rule established is that although an unwarned, uncoerced statement "must be suppressed,"  the admissibility of a subsequent statement depends "solely on whether it is knowingly and voluntarily made." *Id.* at 309.  But where the initial statement is coerced, "the time that passes between confessions, the change in place of interrogation, and the change in the identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310.

The Court considered the midstream warnings practice with a different twist in *Seibert*. There, the police arrested Seibert as a suspect in a deadly fire at her home.  When her son with cerebral palsy died in his sleep, she feared neglect charges so she arranged a fire to conceal the circumstances of his death.  She also left an unrelated mentally ill houseguest to die in the fire to avoid the appearance that her son had been left alone.  At the police station, the police questioned her for 30 to 40 minutes until she confessed that she intended for the houseguest to die in the fire. After a 20-minute break, an officer gave her *Miranda* warnings, obtained a waiver, questioned her a second time and confronted her with her initial statement until she repeated her previous admissions.  Seibert sought to suppress both statements.  The interrogating officer admitted that he intentionally engaged in a two-step interrogation technique to withhold *Miranda* warnings, obtain a confession, then give the warnings and obtain the same information.  The trial court suppressed the initial statement but admitted the second one.  The state appellate court affirmed, but the state supreme court reversed finding that both statements should have been suppressed.

A plurality of the Supreme Court affirmed.  The Court focused on whether the *Miranda* warnings "could reasonably be found effective" in advising the suspect that she had a "real choice about giving an admissible statement at that juncture." *Seibert*, 540 U.S. at 612 n.4.  The Court

-23-

discussed five factors relevant for determining the effectiveness of mid-stream *Miranda* warnings: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [statements], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as a continuation of the first." *Id.* at 615.

In a concurring opinion, Justice Kennedy stated that *Elstad* should govern the admissibility of post-warning statements unless a deliberate "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J. concurring). If a deliberate two-step strategy was used, then the post-warning statements must be excluded absent curative measures "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Ibid.*

The Michigan Court of Appeals did not discuss those factors in detail, but it did find that *Elstad* controlled over *Seibert*, because there was no evidence that the administration of the *Miranda* warnings to the petitioner after he already had made incriminating statements was part of a deliberate attempt "'to undermine the Miranda warning.'" *Curry*, 2012 WL 1959630, at *2 (quoting *Seibert,* 542 U.S. at 622 (Kennedy, J., concurring). Fairminded jurists may disagree with that conclusion, but the state court must be "given the benefit of the doubt" by a federal habeas court. *Renico v. Lett*, 559 U.S. at 773; *see also Harrington*, 562 U.S. at 101 (holding that federal habeas courts must review state court decisions with "deference and latitude," and that "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

-24-

The federal circuit courts have not reached consensus on *Siebert*'s rule. *See United States v. Wooten*, 602 F. App'x 267, 271-72 (6th Cir. 2015) (discussing the cases conflicting on whether *Siebert*'s plurality or concurring opinion controls). Generally, when there is no majority opinion in a Supreme Court decision, the narrowest holding agreed upon by at least five justices controls. *Marks v. United States*, 530 U.S. 188, 193 (1977); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (citing *Marks*). The circuit courts, however, have not agreed on which opinion constitutes the narrower holding. *See Wooten*, 602 F. App'x at 271-72. Many courts have avoided the question by finding that the result is the same under either analysis. *Id.* at 272; *see also United States v. McConer*, 530 F.3d 484, 496-98 (6th Cir. 2008). The Sixth Circuit has concluded that *Seibert* did not announce a binding rule of law with respect to the admissibility standards for statements given after midstream *Miranda* warnings, and adopted the multi-factor test of the *Seibert* plurality as precedent in this Circuit. *United States v. Ray*, 803 F.3d 244, 272-73 (6th Cir. 2015). That does not mean, however, that the state court unreasonably applied *Siebert* by looking to the concurring opinion.

Moreover, *Elstad* makes clear that the petitioner's post-warning statements were not automatically tainted by his pre-warning statements because his initial statements, although given before *Miranda* warnings were given, were not coerced, and the post-warning statements were voluntary. And unlike *Seibert*, in this case there is no evidence that the police deliberately used a two-step interrogation technique to circumvent *Miranda*. To the contrary, Detective Ruth and the petitioner were discussing the circumstances of the petitioner's arrest and his old stomach wound when the conversation turned to victim Dedrick Jackson and the petitioner's claim of self-defense. Detective Ruth testified that he was "surprised" when the petitioner told him that Jackson was the

-25-

person who inflicted the old wound.  After the petitioner responded that he acted in self-defense, Detective Ruth rather quickly told the petitioner that he had to advise him of his rights because he was in custody, gave the *Miranda* warnings in textbook fashion, and obtained a written waiver before continuing with the interview.  Detective Ruth did not intentionally delay *Miranda* warnings or engage in any type of planned or systematic questioning before advising the petitioner of his rights and securing a waiver of those rights.  His conduct resembles that of the police officer in *Elstad* much more than that of the police officer in *Seibert*.

Finally, applying the *Seibert* plurality's multi-factor test leads to the same result.  *First*, the "first round of interrogation" did not produce much about the shooting.  It is true that the petitioner admitted he went to the house and was surprised that Jackson was there, and that Jackson put a gun to his stomach, and they tussled for it.  But when Detective Ruth asked him if he acted in self-defense, and the petitioner responded affirmatively, no further discussion about the incident occurred before the petitioner was advised of his rights and waived those rights.  This factor weighs in favor of a finding that the *Miranda* waiver was effective.

*Second*, the record indicates that although the self-defense theme was present in both statements, the petitioner provided only a brief description of the incident in his pre-warning statement, but discussed the events leading up to the shooting, the shooting, and its aftermath, in much greater, and varying, detail in his lengthy post-warning statement.  This factor weighs in favor of a finding that the *Miranda* waiver was effective.

*Third*, the record indicates that the first and second statements were relatively continuous and both occurred in the same interview room at the police station.  This factor weighs against a finding that the *Miranda* waiver was effective.

*Fourth*, the record indicates that Detective Ruth was present for the pre-warning statement and that Detective Walny entered the interview room and was present with Detective Ruth when the petitioner was advised of his rights, waived those rights, and provided his post-warning statement. This factor is neutral in that Detective Ruth was present for both statements, but the addition of Detective Walny could be seen as change from small talk or preliminary discussions to a more formal interrogation.

*Fifth*, it can be said that Detective Ruth did not treat the second round of questions "as continuous with the first." Detective Ruth specifically assured the petitioner that he did not have to speak with the police, that it was his choice, and that he could stop the interview at any time. In response, the petitioner stated that he wanted to talk, that he knew what he was doing, and that he was not going to "hang himself." Although the self-defense claim was a central issue throughout the interview, Detective's Ruth's post-warning questions were more extensive, systematic, and thorough than his brief, more conversational initial inquiry. Detective Ruth challenged the petitioner's version of events and confronted him with details of the ongoing police investigation. Although reasonable arguments can be made about the import of this factor, on balance, it weighs in favor of a finding that the *Miranda* waiver was effective.

Considering all of the factors, a reasonable person in the petitioner's shoes would have understood that the midstream *Miranda* warnings meant that he retained a choice about whether to continue speaking with the police. To be sure, the petitioner's own declarations that he wanted to speak with the detectives, that he knew what he was doing, and that he was not going to hang himself demonstrate that he was fully aware of his rights and voluntarily elected to waive those rights and continue with the interview. The Michigan Court of Appeals reasonably applied the rule

stated in *Elstad*, and its conclusion that the post-warning statement was admissible is neither contrary to, nor an unreasonable application of, the plurality opinion in *Seibert*.

C.

The admission of the petitioner's pre-warning statement, however, is another matter. The Supreme Court plainly has held that before a criminal defendant's statements made during custodial interrogation may be admitted at trial, the familiar warnings must precede those statements. *Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Elstad*, 470 U.S. at 307 (confirming that "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*"). *Miranda* was a "constitutional decision of [the Supreme] Court," and the warnings are required by the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 432 (2000) (holding that "*Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts"). The command of those cases is clear, and, although periodically invited to do so, the Supreme Court has declined to alter it. *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 304 (1980) (Burger, C. J., concurring in judgment) ("The meaning of *Miranda* has become reasonably clear and law enforcement practices have adjusted to its strictures; I would neither overrule *Miranda*, disparage it, nor extend it at this late date"); *Dickerson*, 530 U.S. at 432. The state courts' decision to admit the petitioner's pre-warning statement was contrary to "*Miranda* and its progeny in [the Supreme] Court."

Although this error is patent, the petitioner cannot win habeas relief unless he also can show that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S.

-28-

112, 117-18 (2007) (confirming that *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in this circuit). He cannot do so here.

It cannot be disputed that "[a] confession is like no other evidence." *Arizona v. Fulminante,* 499 U.S. 279, 296 (1991). That is because "'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . Certainly, confessions have profound impact on the jury. . . .'" *Ibid.* (citations omitted). Here, however, the petitioner's pre-warning statement was a mere trailer to the main event of his second, properly-admitted statement. Whatever influence the first statement had on the jury, it certainly was eclipsed by the fullness of his second statement.

And there was other evidence that established the petitioner's guilt, including the dramatic account of Christopher Ray, the ballistic evidence — which contradicted the petitioner's contention that more than one shooter was involved — and the medical examiner's testimony that the fatal shot most likely was not fired during a struggle. All this adds up to the conclusion that the pre-warning statement did not influence the jury in a "substantial and injurious" way. Therefore, no habeas relief can be based on this constitutional violation.

### III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt #1] is

**DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 20, 2017

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on March 20, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI

-30-